SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
-----------------------------------------------------------------
In the Matter of
ROBIN BHATTACHARYA,

                    *Petitioner/Plaintiff,*

                                            **AMENDED
VERIFIED COMPLAINT**

     -against-

                                            16 Civ. 2763 (VB)     ECF


ROCKLAND COMMUNITY COLLEGE,
SUNY ROCKLAND COMMUNITY COLLEGE
BOARD OF TRUSTEES,
ROCKLAND COMMUNITY COLLEGE
ADJUNCT FACULTY ASSOCIATION,
LOCAL 4896, NYSUT, AFT, AFL-CIO,
AND JERRY BORREGGINE,

                  *Respondents/Defendants.*
-----------------------------------------------------------------

       Plaintiff/Petitioner ROBIN BHATTACHARYA petitions the Court and complains of

Defendants as follows:

## Prefatory Statement

       This Amended Complaint eliminates all federal claims except Plaintiff's First

Amendment claim to free speech and association as a part of academic freedom.

Plaintiff's claims for unlawful discrimination and arbitrary and capricious action are

being pursued only under New York State law as supplemental claims.  Plaintiff has

named an additional individual as respondent in connection with Plaintiff's supplemental

CPLR Article 78 petition claim.  Plaintiff's state law claims (including CPLR Article 78

claim) may become moot if the Court rules favorably upon Plaintiff's First Amendment

claim.

## THE PARTIES

1.   Petitioner/Plaintiff Professor Robin Bhattacharya (hereinafter "Prof. Bhattacharya") is, and was at all times relevant herein a resident of the Town of Clarkstown, County of Rockland, State of New York.

2.   Respondent/Defendant Rockland Community College ("RCC") is a community college unit of the State University of New York (SUNY) and is sponsored by the County of Rockland, with college offices located at 145 College Road, Suffern, NY 10901.

3.   Respondent/Defendant SUNY Rockland Community College Board of Trustees operates and administers RCC, with members appointed pursuant to New York State Education Law § 6306, with offices located at 145 College Road, Suffern, NY 10901.

4.   Respondent/Defendant Rockland Community College Adjunct Faculty Association, Local 4896, NYSUT, AFT, AFL-CIO (hereinafter "Local 4896") is the collective bargaining unit of RCC adjunct faculty, with offices located c/o New York State United Teachers, 520 White Plains Road, 4th Floor, Tarrytown, NY 10591.

5.   Respondent Jerry Borreggine, is, upon information and belief, the president of the Local 4896, and resides at 4 Mohawk Lane, Yorktown Heights, New York 10598, in the County of Westchester, and is sued in his capacity as president and as a member of the local union.

6.   The above-referenced RCC Respondents/Defendants are responsible for the hiring, firing, employing and contracting for the hire of adjunct faculty at RCC.

## PROCEDURAL POSTURE

7.   This is a hybrid civil action/CPLR Article 78 proceeding, originally filed in N.Y.S. supreme court under Rockland County New York index number 030982/2016, and thereafter removed to this Court.

8.   As to the Article 78 aspects of this lawsuit, Prof. Bhattacharya seeks an injunction restoring him to the adjunct faculty, or alternatively, granting him binding arbitration under his union's Collective Bargaining Agreement ("CBA") regarding the termination of his employment and/or non-renewal of his contract.  His union declined to proceed to binding arbitration on March 16, 2016.

9.   RCC's and its agents' actions as a public educational institution were, as alleged herein, in violation of Prof. Bhattacharya's First Amendment rights of speech and association, including his First Amendment rights to academic freedom.

10. As to the civil action aspects of this lawsuit, Prof. Bhattacharya seeks declaratory and injunctive relief, namely, a declaration that his federal and New York State rights have been violated; an injunction restoring him to the adjunct faculty; and an award of damages.

11. The only federal claim in this Amended Complaint are for the violation of Prof. Bhattacharya's First Amendment speech and association rights, actionable under 42 U.S.C. § 1983.

## FACTS

**Background**

12. Prof. Bhattacharya is a 70 year old college educator, originally from India (ethnically Indian and with dark skin).  He is a naturalized U.S. citizen.

13. Prof. Bhattacharya had and has for many years taught on the adjunct faculty of colleges and universities, such as Mercy College (2004-2009), NYU Polytechnic (2009 - current) and St. Thomas Aquinas College (2015 – current).  His *Curriculum Vitae* is attached as Exhibit "1".

14. Prof. Bhattacharya was an adjunct Professor at RCC from 2009 through the non-renewal of his contract in May 2015.

15. His teaching disciplines are Economics and Finance.

16. During his entire period of employment with RCC, Prof. Bhattacharya has had no negative reviews from the students or from the faculty, except for one unsigned and unsubstantiated  written complaint discussed next.

**Fundamentals of Finance instruction**

17. In the fall of 2015, Prof. Bhattacharya was teaching a Fundamentals of Finance class in the evenings at RCC.

18. This course requires of its students basic Mathematical and Accounting knowledge in order for the student to understand the course material.

19. Prof. Bhattacharya  provided the course outline (Syllabus) and Examinations schedule to the students at the beginning of the semester.  Prof. Bhattacharya also encouraged the students to communicate with him either via phone or e-mail in the event of any of them had difficulty understanding his lectures. Moreover, Prof. Bhattacharya encouraged the students to meet him during the weekends at the College library (in the event they desired additional help).

20. Since the course requires knowledge of finance-related mathematics, some of the students had difficulty using a financial calculator to solve problems.  Prof. Bhattacharya provided remedial help.

21. A number of students did not purchase the required course text book.  This made it difficult for those students to follow Prof. Bhattacharya's lectures.  Nevertheless, Prof. Bhattacharya provided his class lecture notes to the students as an outline after each and every lecture.

22. Before any quiz or examination, it was Prof. Bhattacharya's normal practice to review with the students the types of questions they could expect, and the general areas of testing.

23. Each of the above measures taken by Prof. Bhattacharya had been successfully used by him during his prior 6 years teaching courses at RCC, resulting in educated students and student praise.

24. One of Prof. Bhattacharya's duties as an adjunct was the fair evaluation of students' learning in the classes he taught, with grades issued pursuant to RCC's Academic Grading System.[1]

25. Prof. Bhattacharya believes in academic honesty and was hired by RCC with the mutual understanding that academic honesty, including the fair and honest evaluation of the learning of students, was and is a requirement at RCC, at SUNY institutions, and is fundamental to the integrity of higher education.

**Academic Freedom and Obligation of Professors
to their Classrooms and the Public**

26. Any respectable institution of higher learning, and certainly any college or university of the State University of New York system, including RCC, represents to the public that its graduates have been educated sufficiently, as corroborated by an evaluation of their academic learning by their professors and the eventual award of an academic degree bestowed by the institution.

27. RCC, as a two year community college, awards an associate's degree.

28. The students in Prof. Bhattacharya's class were matriculated students seeking an associate's degree from RCC.

29. It was Prof. Bhattacharya's obligation as a RCC teacher (an adjunct professor) to ensure that his students' academic learning from his courses was sufficient to be awarded credit for the course by RCC.

---

[1] *See*, web pages available at: http://www.sunyrockland.edu/about/college-policies/academic-policies-and-procedures/academic-grading-system.

30. If Prof. Bhattacharya's students did not adequately learn the material taught, for example, if a student's learning was so deficient as to warrant a "failing" grade (or grade of "F"), it was not only Prof. Bhattacharya's professional obligation as a teacher, but also his personal obligation as a citizen, to express to the student, to the educational institution (RCC, as part of the SUNY system) and to the public (via the student's academic transcript) that the student did not adequately learn the course material, by issuing a grade of "F".

31. Similarly, it was Prof. Bhattacharya's obligation professionally and personally, as a professor, to express to the student, to the college and to the public (via an academic transcript, if requested, say, by a graduate institution or a future employer) the extent to which the student learned the course material with a "passing" grade ranging from "A" through "D".

32. Upon information and belief, RCC did not want, and does not want, any one of its students to earn college credit for an RCC course in which the student failed to learn the course material warranting a failing ("F") grade.

33. Prof. Bhattacharya  believes it is fundamental to his academic freedom as an adjunct professor to issue to his students only those grades that his students earned in his courses.

34. Upon information and belief, RCC policy is that its teachers issue to RCC students only those grades that the students earned by learning the material taught by its teachers in the RCC course being taught.

35. RCC is a taxpayer-funded public institution.

36. The award of a grade to a student by a teacher, who also reports the grade to the institution, is a form of speech by the teacher (here, Prof. Bhattacharya).

37. The grading of students is also a form of speech that reflects upon the professionalism and skills of the professor, because the quality of the student (and eventual college graduate) reflects the quality of the teacher.

38. If, for example, teachers (facilitated by the academic institution) award grades of A and graduation *summa cum laude* to students whose actual learning is deficient or failing, this will reflect unfavorably both on the teachers and the institution.

39. Academic honesty—a cornerstone of academic freedom—necessitates that college teachers properly evaluate the academic performance of their students.

40. Prof. Bhattacharya's right to free speech would be chilled, and he would seek employment outside of the SUNY system, if he thought he would be punished, and his employment terminated, for being forced to award undeserved grades to unworthy students—for example, being forced to award a passing grade to a student who deserved a failing grade.

41. Upon information and belief, any teacher with integrity would be disinclined to work for an academic institution that condoned academic dishonesty, and permitted retaliation against teachers who insisted upon academic honesty, including honesty in grading students.

42. RCC's policy on "academic freedom," found on its website,[2] and stated as follows:

> *"Reaffirmed by the Board of Trustees of SUNY Rockland Community College on December 16, 1989 Note: The Rockland Community College Board of Trustees reaffirmed the policy of the State University of New York cited below. This policy on academic freedom is embodied in Article XI, Title I of the Policies of the Board, section 335.27 of Title 8 of the Official Compilation of Codes, Rules and Regulations of the State of New York.*

ACADEMIC FREEDOM
The teacher is entitled to full academic freedom in research and in the publication of the results, subject to the adequate performance of his other academic duties, but research for

---

[2] *See*, RCC webpage found at: http://www.sunyrockland.edu/about/college-policies/academic-policies-and-procedures/academic-freedom.

pecuniary return should be based upon an understanding with the authorities of this institution.

The teacher is entitled to freedom in the classroom in discussing his or her subject, but he or she should be careful not to introduce in his or her teaching controversial matter which has no relation to his or her subject. Limitations of academic freedom because of religious or other aims of the institution should be clearly stated in writing at the time of the appointment.

The college or university teacher is a citizen, a member of a learned profession, and an officer of an educational institution. When one speaks or writes as a citizen, one should be free from institutional censorship or discipline, but one's special position in the community imposes special obligations. As a person of learning and an educational officer, one should remember that the public may judge one's profession and institution by one's utterances. Hence, one should at all times be accurate, should exercise appropriate restraint, should show respect for the opinion of others, and should make every effort to indicate that one is not an institutional spokesperson." (*emphasis added*)

43. RCC's policy embodies the State University of New York's policy on "academic freedom," found on its website,[3] and stated as follows:

## "TITLE I – ACADEMIC FREEDOM

### § 335.27 Academic freedom.

It is the policy of the university to maintain and encourage full freedom, within the law, of inquiry, teaching and research. In the exercise of this freedom faculty members may, without limitation, discuss their own subject in the classroom; they may not, however, claim as their right the privilege of discussing in their classroom controversial matter which has no relation to their subject. The principle of academic freedom shall be accompanied by a corresponding principle of responsibility. In their role as citizens, employees have the same freedoms as other citizens. However, in their extramural utterances employees have an obligation to indicate that they are not institutional spokespersons." (*emphasis added*)

44. Prof. Bhattacharya believes that it was his professional obligation, and part of his academic freedom as an adjunct professor, to fairly and accurately assess his students' learning in the academic courses he taught at RCC and at other institutions.

---

[3] *See*, SUNY webpage found at: https://www.suny.edu/sunypp/documents.cfm?doc_id=291; *see also*, 8 N.Y.C.R.R. § 335.27 (*official version*).

8

45. Moreover, Prof. Bhattacharya would not be adhering to the "principle of responsibility" if he permitted academic dishonesty in the courses he instructed and with regard to the students he evaluated.

**Small group of students demand academic dishonesty—Prof. Bhattacharya is then fired**

46. Prof. Bhattacharya was shocked to find that his contract was not renewed, after 6 years of outstanding performance as an adjunct professor, after Prof. Bhattacharya stood up for academic honesty and against academic dishonesty, and refused to be extorted by a small group of students in one of his classes into allowed them to receive an unwarranted grade by receiving in advance the answers to the final examination (i.e., cheating on the examination).

47. RCC's official, published policy abhors academic dishonesty. Specifically, RCC's policy, available on its website, [4] states in relevant part:

> **"Academic Dishonesty**
> Academic Dishonesty includes, but is not limited to the following:
> - Cheating on an examination;
> ***
> - Stealing or possessing stolen examinations or course materials;
> ***
> - Receiving help from others in work to be submitted, if contrary to stated course rules. This includes use of complete or partial papers from Internet paper mills or other sources of non-original work without attribution."

48. Five days before the final examination in April 2015, a group of about five students demanded that Prof. Bhattacharya provide them with all the test questions and answers in advance of the final.

49. Prof. Bhattacharya's response to them was an unequivocal "no."  He indicated that he would not grant their request under any circumstances.

---

[4] *See*, webpage available at: http://www.sunyrockland.edu/about/college-policies/academic-policies-and-procedures/classroom-conduct .

50. Shortly thereafter, Prof. Bhattacharya found himself the subject of a complaint letter, allegedly on behalf of some of his students. The letter was unsigned.

51. Prof. Bhattacharya was shown this letter by Division Chair Cathy Roche.

52. Prof. Bhattacharya explained to Chairwoman Roche that a small group of students wanted the answers to the final examination for the course he was teaching, and that undoubtedly one (or more) of these students was behind the unsigned letter.

53. Prof. Bhattacharya expected Chairwoman Roche to be shocked by his students' desire to commit academic dishonesty.

54. Indeed, it appears Chairwoman Roche is the co-author, with L. Aaron, of an article entitled "Stemming the Tide of Academic Dishonesty in Higher Education: It Takes a Village," published in the *Journal of Educational Technology Systems*, Vol. 42(2) 161-196, 2013-2014.

55. Yet Chairwoman Roche appeared more concern that the students who wanted to cheat made a complaint, than about their efforts to cheat and their motive to make a false complaint after Prof. Bhattacharya refused to permit the cheating.

56. Prof. Bhattacharya was shocked by the false contents of the anonymous letter. He discussed this with Chairwoman Roche.

57. Specifically, Prof. Bhattacharya tried to explain the above facts to his Chairwoman Roche, but she had ignored everything he said and decided, without just cause or any investigation whatsoever, that Prof. Bhattacharya's contract would not be renewed.

58. Prof. Bhattacharya asked his Fundaments of Finance students about the issues and content material of the letter and their views as to the letter's validity.

59. Specifically, after his meeting with Charwoman Roche, Prof. Bhattacharya informed the students in his class that he had been given a letter addressed to RCC accusing him of doing a poor job of teaching this class.

60. Immediately thereafter he received several unsolicited emails from his students protesting the accusations against him, and voicing support for him. *See*, ¶¶ 73-75, below.

61. A large number of his students stood up in the class and protested the contents of the letter, and supported Prof. Bhattacharya.

62. Department Chair Roche's and RCC's decision not to renew Prof. Bhattacharya's contract as an adjunct professor was the direct result of his refusal to provide examination answers to a small group of his students, and Chairwoman Roche's decision to countenance this attempt at academic dishonesty by the small group of students at the expense of not only Prof. Bhattacharya, but also the other students in the class (who expressed no desire to cheat) and the college and SUNY system.

63. Upon information and belief, by terminating Prof. Bhattacharya's employment (by non-renewal of his contract) after he refused to provide a small group of RCC students with the answers to the final examination, RCC countenanced academic dishonesty and set a precedent for other students to attempt to coerce or extort teachers into academic dishonesty (e.g., by demanding examination answers in advance of an examination).

64. Upon information and belief, punishing a teacher who refuses to allow academic dishonesty infringes upon the teacher's right to speech with regard to his or her students' academic performance.

65. Upon information and belief, punishing a teacher who refuses to allow academic dishonesty also infringes upon the teacher's right to freedom of association, including association with:

a. Other teachers who believe in academic honesty and fairly grading students;

b. Honest students, who believe and expect that the grading of all students in a class with be done honestly and fairly;

c. other colleges and universities in the SUNY system, which institutions undoubtedly expect that all teachers in the SUNY system (including adjunct professors at RCC) will grade students honestly and fairly (and within the SUNY system, each SUNY school accepts the credits of any other SUNY school, including RCC); and

d. non-SUNY colleges and universities that expect teachers' academic honesty (and who will not likely associate with professors viewed as academic frauds because their grading of students is fraudulent).

66. By explicitly pronouncing as its official policy that RCC teachers keep their rights as citizens, this includes their right to associate with other teachers and institutions, as described above.

67. Chairwoman Roche asked a new RCC professor, George Repic, to "investigate" the unsigned student complaint.

68. Prof. Repic was Prof. Bhattacharya's colleague and peer, but possessed much less subject matter competence in economics and finance than did Plaintiff.

69. Upon information and belief, Chairwoman Roche knew that Prof. Repic wished to take over Prof. Bhattacharya's some or all of Prof. Bhattacharya's classes, including the

Fundaments of Finance class he was teaching (and after Prof. Bhattacharya's termination, Prof. Repic did in fact take over that class).

70. At a meeting held with Prof. Bhattacharya on May 14, 2015, Prof. Repic essentially informed Prof. Bhattacharya that he should tolerate low academic standards, and told Prof. Bhattacharya that his standards were "too high," noting that Prof. Bhattacharya had taught or was teaching at colleges with higher academic standards than RCC (e.g., Mercy College and NYU Polytechnic School of Engineering).

71. In connection with the discussion of RCC academic standards, including discussion about the small group of students who desired to cheat in his class, Prof. Repic warned that Prof. Bhattacharya needed to tolerate lower standards (and academic cheating) and stated to Prof. Bhattacharya: "My friend, my friend, you are going to face a tough time at RCC."

72. Prof. Repic (who is originally from Yugoslavia) then stated: "this freaking country [the United States] does not have educational standards."

73. Prof. Repic did not inquire about the students who sought to cheat, nor did he have any response to Prof. Bhattacharya's statement to Prof. Repic that the student or students who were likely complaining "were barely passing the class as they did not come prepared with any home study and never came for extra weekend help despite [Prof. Bhattacharya] offering this at [his] own time and expense."

74. Thus, Prof. Repic was condoning academic dishonesty. His subsequent report to Chairwoman Roche of what he supposedly found was a baseless hatchet job designed to cause Prof. Bhattacharya's elimination from RCC for refusing to engage in academic dishonesty and refusing to allow cheating on the final examination.

75. Prof. Bhattacharya's students observed that Prof. Repic was not acting in a fair and unbiased manner when he visited Prof. Bhattacharya's class.

76. Specifically, Prof. Bhattacharya's students (via an email from student Christopher M.) were supportive of Prof. Bhattacharya and critical of Prof. Repic:

> "…when Professor Repik approached the class, he only focused on things that he felt were negative.  As students in the professor's class [Prof. Bhattacharya's] we feel that Professor Repik was out of line….
> ***
> … We feel that Prof. Bhattacharya is a great asset to [RCC].  Please allow him to continue to share his wisdom with the students in the program.
> Sincerely,
> The Students of Professor Bhattacharya"

77. Prof. Bhattacharya received several other supportive emails from his students.

78. Upon information and belief, each of the students who sent Prof. Bhattacharya a supportive email wanted fair grading and academic honesty in his classroom, and would be very upset and disappointed in Prof. Bhattacharya (and likely would not want to associate with him in the future) if he favored a small group of students with advance answers to a final examination.

**RCC decision-making – for State law supplemental claims**

79. Chairwoman Roche is a non-Indian Caucasian woman.

80. Upon information and belief, all RCC decision-makers were U.S.-born, non-Indian and Caucasian.

81. Each of the adverse actions against Prof. Bhattacharya described above can be attributed to unlawful discrimination.

82. Additionally, Prof. Bhattacharya complained to Chairwoman Roche that some students are using racial/ethnic slurs against him in the class.

83. Instead of talking action against those students, Chairwoman Roche completely ignored the racially-/ethnically-biased harassment, and then discriminated against Prof. Bhattacharya by not renewing his RCC teaching contract.

**Union non-support – for State law claims**

84. Prof. Bhattacharya brought this matter immediately to his union, the Respondent/Defendant herein, and it pursued, up to "step 3," a grievance regarding his dismissal/non-renewal.

85. Specifically, the Union informed RCC on November 6, 2015 that the Union was seeking arbitration of Prof. Bhattacharya's grievance.

86. However, on March 16, 2016, the Respondent Union's executive committee made a final decision not to pursue binding arbitration on Prof. Bhattacharya's behalf.   (This decision was within 10 days of the filing of this lawsuit.)

87. Upon information and belief, all members of the Union authorized and ratified the action of the Union's executive committee and the Union's other adverse action against Prof. Bhattacharya.

88. Moreover, if the action of the Executive Committee was not authorized or ratified, then the Executive Committee's decision not to pursue binding arbitration for Prof. Bhattacharya was *ultra vires* and a nullity, and binding arbitration should have been granted.

89. Prof. Bhattacharya was singled out for disparate treatment by his union (including not granting him binding arbitration), upon information and belief, due to his national origin, his ethnicity and his race

90. Specific comments were made about Prof. Bhattacharya being a "f---g Indian Professor."

91. Other union members (U.S.-born, non-Indian) were granted Arbitration hearings regarding accusations far more egregious than the clearly baseless and unsubstantiated accusations made against Prof. Bhattacharya.

92. Specifically, the Union represented the following U.S.-born, non-Indian through arbitration:

- ➢ Prof Buckley
- ➢ Prof Eric Jimenz
- ➢ Another adjunct professor (name unknown)

93. Prof. Bhattacharya, upon information and belief, was discriminated against and denied binding arbitration based upon his national origin and ethnicity, and his race and his skin color (dark).

94. Union President Borregine openly made remarks in the Board Meeting that he would not consider another arbitration against the college because Mr. Borreggine's son works for a project at RCC. He expressed the view that if he was part of a decision of filing another arbitration against RCC, this might jeopardize his son's situation at the college and college may take retribution.

95. Any such decision-making is arbitrary, capricious and an abuse of discretion within the meaning of CPLR Article 78.

**Damages**

96. Prof. Bhattacharya has suffered the following economic loss as a result of the wrongful termination of his contract of employment:

    a.   Loss of teaching privilege equates to a loss of income of approximately $39,000 per year;

b.  The disparagement against him makes future employment with other employers more difficult.

97. Plaintiff has also suffered substantial non-economic harm, including emotional damage, and damage to his reputation.

### FIRST FEDERAL CLAIM FOR RELIEF— VIOLATION OF PROF. BHATTACHARYA'S FIRST AMENDMENT RIGHTS TO FREE SPEECH AND FREEDOM OF ASSOCIATION (RCC'S INFRINGEMENT UPON HIS ACADEMIC FREEDOM)

98. Plaintiff Bhattacharya repeats and reiterates each of the allegations above.

99. Prof. Bhattacharya, as an adjunct college professor at a State-run (SUNY- and Rockland County-operated) public college was guaranteed the protection of the First Amendment to the United States Constitution, and the N.Y.S. Constitution, regarding his rights to free speech and freedom of association, both in relation to academic freedom.

100.    Respondents RCC and its Trustees deprived Prof. Bhattacharya of his rights to free speech, association and academic freedom by deeming an unsubstantiated (and malicious) unsigned letter accusing Prof. Bhattacharya of poor methods and skills, where Prof. Bhattacharya has a proven record of excellent teaching methods and skills, and where in the very class at issue other students vouched for Prof. Bhattacharya's excellent teaching abilities.

101.    Specifically, RCC and its academic management (Chairwoman Roche and Professor Repic) were advised that a small group of students demanded that Prof. Bhattacharya provide them with the answers to his final examination in the Fundamentals of Finance.

102.    Prof. Bhattacharya refused to agree to participate in such academic dishonesty— students cheating on his final examination.

103.    RCC responded by not renewing Prof. Bhattacharya's contract as an adjunct professor, after 6 years of highly successful performance.

104. Prof. Bhattacharya was deprived of academic freedom, and free speech and associational rights, where the students at this public community college attempted to obtain Prof. Bhattacharya's cooperation with academic dishonesty (by giving them examination answers), with the students then alleging falsehoods (e.g., that Prof. Bhattacharya is a poor instructor) to cover up their attempted academic dishonesty and potential RCC discipline for the attempted cheating.

105. Allowing Prof. Bhattacharya to be punished for refusing to engage in academic dishonesty will chill what is most fundamental to academia, namely, academic integrity, and as such, it is a First Amendment interest affecting the rights of all.

106. Terminating an adjunct professor because he would not engage in academic dishonesty also impairs and denies him freedom of association, for the reasons stated above, including but not limited to causing him to lose associations with students, RCC faculty, SUNY faculty and other colleges/universities' faculty because Prof. Bhattacharya had the integrity to refuse to engage in academic dishonesty.

107. Plaintiff was damaged thereby.

### FIRST SUPPLEMENTAL N.Y.S. CLAIM-- PETITIONER BHATTACHARYA REQUESTS RELIEF UNDER CPLR ARTICLE 78

108. Plaintiff Bhattacharya repeats and reiterates each of the allegations above.

109. The Union and is representatives, and RCC and its representatives, are each a body or officer and have made a determination, as to RCC by denying renewal of Prof. Bhattacharya's contract of employment, and as to the Union deciding not to pursue binding arbitration for Prof. Bhattacharya, which respective determinations were made in violation of lawful procedure, were affected by an error of law or were arbitrary and capricious or an abuse

of discretion, and therefore subject to a special proceeding under CPLR Article 78. *See*, CPLR §§ 7801- 7804.

## A. Injunctive relief retroactively renewing his Adjunct Professor contract

110. Prof. Bhattacharya requests that the NYS supreme court grant Prof. Bhattacharya Article 78 relief, in that the action of RCC and its Trustees in not renewing Prof. Bhattacharya's adjunct professor contract, and terminating his employment, was arbitrary, capricious, and abuse of discretion and in violation of law.

111. Specifically, a small group of students insisted that Prof. Bhattacharya provide the students with the answers to a test Prof. Bhattacharya would give in the course he was teaching, the Fundamentals of Finance. Essentially, the students wanted Prof. Bhattacharya to help them cheat.

112. Prof. Bhattacharya refused to engage in this academic dishonesty.

113. The student or students thereafter wrote a false letter critical of Prof. Bhattacharya's teaching methods and abilities, with the intent of causing his termination after 6 years of excellent performance and excellent reviews.

114. Upon information and belief, another professor had his sights set on taking over Prof. Bhattacharya's classes if possible, and facilitated the student or students' malicious and defamatory criticism of Prof. Bhattacharya for the purpose of advancing the other (much junior and less credentialed) adjunct professor's personal gain and advancement.

115. Upon information and belief, the Defendants/Respondents have no credible evidence that Prof. Bhattacharya's performance as an adjunct professor was deficient in any way, and have proffered only an unsigned letter of suspicious origin and malicious intent.

116. Many students in the class Prof. Bhattacharya was teaching have attested to his excellent teaching abilities and compassion for students and their academic growth and success.

117.     Prof. Bhattacharya has never before been terminated from a teaching position, and has taught or is teaching at many highly respected institutions of higher learning.

## B.  Injunctive relief requiring binding arbitration under the CBA

118.     Upon information and belief, under the Collective Bargaining Agreement (CBA) between RCC and the Respondent Union, Prof. Bhattacharya is entitled to academic freedom, and to protection against termination or non-renewal of his contract based upon the denial of his academic freedom and First Amendment rights of free speech and association.

119.     Prof. Bhattacharya was also a former officer of the local union, the current leadership of which disdained that Prof. Bhattacharya associated as a union officer with union members and other officers.

120.     Upon information and belief, the current union leadership retaliated against Prof. Bhattacharya, by refusing to support his request for binding arbitration of the non-renewal of his contract based upon his prior associations and work and speech as a union leader.

121.     Upon information and belief, the union leadership discriminated against Prof. Bhattacharya on the basis of his ethnicity, national origin and race in refusing to allow him binding arbitration.

122.     Upon information and belief, the union leadership (its executive committee) made its final decision regarding whether or not to support Prof. Bhattacharya's request for binding arbitration on March 16, 2106.    It decided to decline binding arbitration for Prof. Bhattacharya. This lawsuit is filed within 10 days from such date.

123.     The union's decision not to allow Prof. Bhattacharya binding arbitration, whereby his contract of employment could be restored, is arbitrary, capricious, an abuse of discretion and contrary to law.

### C. Breach of Duty of Fair Representation

124.    In engaging in unlawful discrimination and arbitrary and capricious conduct against Prof. Bhattacharya, the Union additionally breached its duty of fair representation of Prof. Bhattacharya.

125.    Upon information and belief, the Union and its representatives knew that Prof. Bhattacharya had a meritorious grievance, and intentionally (rather than by mere neglect or error in evaluating the merits of the grievance) refused to pursue binding arbitration.

126.    Rather, the Union's action was taken in bad faith, motivated by hostile discrimination, and was so far outside the range of reasonableness to be irrational. The Union's action was worse than arbitrary, though arbitrary action breaches the duty of fair representation.

127.    Upon information and belief, the Union's concerns were not to avoid pursuit of a frivolous or unlikely successful arbitration, but rather its concerns were illegitimate, namely, getting rid of Prof. Bhattacharya for improper reasons.

128.    In the context of an Article 78 proceeding, Prof. Bhattacharya is entitled to a jury trial on disputed issues of fact, including the motivation of the Union in not pursuing an arbitration on his behalf.

## SECOND SUPPLEMENTAL N.Y.S. CLAIM-- PLAINTIFF BHATTACHARYA REQUESTS DECLARATORY, INJUNCTIVE AND DAMAGES RELIEF

129.    Plaintiff Bhattacharya repeats and reiterates each of the allegations above.

130.    This Court should declare that Prof. Bhattacharya was entitled to binding arbitration under his union's CBA with RCC, and direct and enjoin such arbitration to take place.

## THIRD SUPPLEMENTAL N.Y.S. CLAIM-- DEFAMATION

131.    Plaintiff Bhattacharya repeats and reiterates each of the allegations above.

132.     Respondent RCC's publication of an unsigned and unsubstantiated document that knowingly disparages Prof. Bhattacharya's good name and professional reputation, by stating that he was unable to teach the course material, amounts to defamation *per se*.

133.     Upon information and belief, the adjunct professor who visited Prof. Bhattacharya's classroom maliciously and with self-interest communicated defamatory statements about Prof. Bhattacharya to RCC, as well as to the students present, including but not limited to words that "Prof. Bhattacharya does not know how to teach this course."

134.     Additionally, the publication of an unsigned accusatory letter, purportedly from a student, to RCC and union personnel, with maliciously false statements of purported fact, amounts to actionable defamation.

135.     Prof. Bhattacharya was damaged thereby.

## FOURTH SUPPLEMENTAL N.Y.S. CLAIM--
## BREACH OF CONTRACT

136.     Plaintiff Bhattacharya repeats and reiterates each of the allegations above.

137.     The Defendants RCC's and its Trustees actions, in terminating Prof. Bhattacharya's contract because of his academic integrity and unwillingness to allow academic dishonesty by students in his classroom was in violation of RCC's contractual rights owed to Prof. Bhattacharya, and violated implied covenants of good faith and fair dealing owed by RCC toward Prof. Bhattacharya.

138.     Plaintiff was damaged thereby.

## FIFTH SUPPLEMENTAL N.Y.S. CLAIM--
## VIOLATION OF N.Y.S. HUMAN RIGHTS LAW

139.     Plaintiff Bhattacharya repeats and reiterates each of the allegations above.

140. Defendants' action were motivated by unlawful bias, namely, race, national origin and ethnicity discrimination, in violation of the N.Y.S. Human Rights Law. *See*, N.Y.S. Executive Law § 296 et seq.

141. Plaintiff was damaged thereby.

## DEMAND FOR JURY TRIAL

142. Plaintiff demands a jury trial regarding all matters triable by jury.

WHEREFORE, Petitioner/Plaintiff Robin Bhattacharya prays that this Court grant him the relief sought in this hybrid Article 78 proceeding and action, namely,

as to his civil action:

    a. granting Prof. Bhattacharya damages, and injunctive and declaratory relief, for RCC's violation of the First Amendment to the U.S. Constitution (Plaintiff's sole federal claim herein);

    b. granting Prof. Bhattacharya damages, and injunctive and declaratory relief, for RCC's and its Trustee's unlawful actions alleged herein as violation of N.Y.S. law;

    c. together with such other and further relief as the Court may direct.

as to his article 78 proceeding:

    a. determining that the Respondent RCC and its Trustees actions in not renewing Prof. Bhattacharya's contract of employment, and thus terminating his employment (via non-renewal of his contract), were arbitrary, capricious, and abuse of discretion and contrary to law, and retroactively reinstating his employment, with back pay;  or alternatively,

b. determining that the Respondent Union's actions were arbitrary, capricious, and abuse of discretion and contrary to law in denying him binding arbitration, and remanding to the Respondents with direction to grant Prof. Bhattacharya binding arbitration;

c. granting trial by jury of any triable fact at issue (CPLR § 7804(h)).

Dated: Stony Point, New York
        June 29, 2016

_____/S/_____
MICHAEL D. DIEDERICH, JR.
*Attorney for Petitioner/Plaintiff*
361 Route 210
Stony Point, N.Y. 10980
(845) 942-0795
*Mike@DiederichLaw.com*


Petitioner's/Plaintiff's  Exhibits:
1. Prof. Bhattacharya's *Curriculum Vitae*

## **Verification**

I am the petitioner in this proceeding, that I have read the foregoing Amended Complaint and know the contents thereof, that the same is true to my own knowledge, except as to matters therein stated to be alleged on information and belief, and that as to those matters I believe them to be true.

ROBIN BHATTACHARYA

Sworn to before me this 29 th.
day of June 2016

Notary Public

**Michael D. Diederich, Jr.**
NOTARY PUBLIC, New York State
Reg. # 4936132, Rockland County
Comm'n expires 13 June 2018

# Exhibit "1"

## *Curriculum Vitae*

### Robin N. Bhattacharya
**25 Tempo Road**
**New City, N.Y.10956**

**Education**: B.A. (Honors) (University of Calcutta, India)
MA (University of Calcutta, India)
Bachelors of Law (LLB) University College of Law, Calcutta, India
MS in Investment Banking& Finance, Mercy College, New York

**Teaching Experience**: World Institute of Banking ( New York), Adjunct lecturer on Banking 2004

Mercy College, New York- Adjunct lecturer on Finance & Banking 2004-2009

NYU (Poly) New York and Westchester Campus, Adjunct lecturer on Finance & Economics 2009- current

RCC, NY Adjunct Professor of Economics & Finance 2009- 2015

STAC, N.Y:- Adjunct Professor of Finance & Economics 2015- current

**Intl Teaching Experience**: - Visiting Professor of Finance, University of Rome, Italy 2011

Visiting Professor of Finance, Amity School of Business,
University of Delhi, India, 2014

**Publications & Industry lecturer**: Various Business Magazines and Professional Associations on the topics of Finance & Economics